Filed 3/1/23  P. v. Witherspoon CA2/7

Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> RODERICK WITHERSPOON, <br><br> Defendant and Appellant. | B303406 <br><br> (Los Angeles County Super. Ct. No. BA008291) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  David Herriford, Judge.  Affirmed.

Larry Pizarro and Mark L. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Daniel Chang and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

We consider for the second time Roderick Witherspoon's appeal from the superior court's order denying his petition under Penal Code section 1172.6[1] (former section 1170.95). In 1991 a jury found Witherspoon guilty of first degree murder for the killing of Vincent Rucker, and the trial court sentenced Witherspoon to a prison term of 25 years to life. The verdict form did not indicate whether the jury convicted Witherspoon of deliberate, premeditated murder or of robbery felony murder. On direct appeal, we affirmed the conviction. In his section 1172.6 petition, Witherspoon sought an order vacating his conviction, arguing he could not now be convicted of first degree felony murder after the revisions to section 189, subdivision (e)(3). The superior court denied the petition, finding that Witherspoon was a major participant in the underlying felony and acted with reckless indifference to human life, as defined by *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

In October 2020 we affirmed the superior court's order denying Witherspoon's petition. We rejected Witherspoon's arguments that the superior court applied the wrong burden of proof at the hearing on his petition, relied on inadmissible hearsay, and had insufficient evidence to find he acted with reckless indifference to human life. The California Supreme Court granted Witherspoon's petition for review in light of its then-pending consideration of *People v. Lewis* (2021) 11 Cal.5th

---

[1] Undesignated statutory references are to the Penal Code.

952 (*Lewis*). While the case was still pending review, the Legislature passed and the Governor signed, effective January 1, 2022, Senate Bill No. 775 (Stats. 2021, ch. 551, § 1, subd. (b)) (SB 775), which amended section 1172.6 in ways relevant to Witherspoon's appeal. On October 12, 2022, the Supreme Court transferred the cause back to this court with directions to vacate our decision and reconsider it in light of SB 775. We received and considered supplemental briefing from the parties addressing the statutory changes. The amendments to section 1172.6 do not alter our view of the burden of proof applied by the superior court or otherwise change the resolution of the matter. We again affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Rucker's Cocaine Plan Ends in His Murder*

Rucker and his half-brother, Wendell Harris, hatched a plot to buy cocaine in Los Angeles and resell it in Michigan, where Rucker lived.[2] Wendell claimed to have connections in Los Angeles, where he lived. On August 27, 1989, Rucker flew from Michigan to Los Angeles. Rucker carried with him nearly $200,000, enough to buy 15 or more kilograms of cocaine. Rucker went directly to his sister Yolanda Muwwakkil's house, where she lived with her husband, Joel Muwwakkil,[3] and their three small children. When it turned out that Wendell "didn't know

---

[2]　　We refer to Wendell Harris by his first name to avoid confusion with George Harris, his father.

[3]　　We refer to the Muwwakkils by their first names to avoid confusion.

nothing he said he did," Rucker called their father back in Michigan, George Harris (who knew about the plan) and asked Harris for help securing a more reliable cocaine connection. At Rucker's suggestion, Harris called Harris's friend, Johnny Johnson. Johnson patched Witherspoon into the call and introduced him to Harris. Witherspoon claimed to have access to 15 to 20 kilograms of cocaine that he promised to sell to Rucker. Harris gave Witherspoon the phone numbers for Rucker and Yolanda; Witherspoon promised to "take care of" Rucker. Witherspoon called Rucker that same day, leading Rucker to "stick around a day or two and see what's happening." Over the next few days, Rucker stayed at Yolanda's house waiting for Witherspoon to conclude the arrangements. Rucker and Witherspoon met at least once during this time when Witherspoon picked Rucker up from Yolanda's house in Witherspoon's red Nissan Maxima and took him to Witherspoon's house.

On September 5, 1989, Rucker told his father he planned to meet with Witherspoon the following day, then hopefully return to Michigan that evening. On the afternoon of September 6, 1989, Rucker met Witherspoon at Yolanda and Joel's house. Also present were two or three other men Joel did not know and Bill, an acquaintance of Rucker's from Michigan. Joel observed the men in his driveway next to a gray Ford. Joel could see a pillowcase and "neatly stacked" money—"quite a bit"—covering two-thirds of the Ford's backseat. He saw Witherspoon back a red Nissan Maxima into the driveway, at which point Rucker carried a nearly full pillowcase from the Ford's backseat to the Nissan's backseat. The situation made Joel "agitated, upset, nervous." He went back inside and told Yolanda, who had just

arrived, that she needed to instruct Rucker to leave. Yolanda went outside and told Rucker "they had to go." Rucker told his sister he "had to make a run" and asked for a ride to the airport when he returned. He then left with Witherspoon in Witherspoon's red Nissan Maxima. The other men, including Bill, left in the Ford going in a different direction. Rucker did not return to his sister's house that night, staying instead with Witherspoon at the home of Rhonda Durham, Witherspoon's girlfriend. On September 7, 1989—the day of Rucker's murder—Rucker and Witherspoon left Rhonda's house in Witherspoon's car around 8:00 a.m.

Around 4:00 to 4:30 p.m. that day, Rucker went alone to the Music Staff, an "adult entertainment bar" near his motel. He called Joel from the bar, told him he was ready to return to Michigan, and asked Joel to let Rucker's friends know to gather at Joel's house at 9:30 p.m. that evening. Rucker left the bar alone.

At 8:23 p.m. that evening, Witherspoon called Rucker's motel. Between 8:35 and 8:40 p.m. Witherspoon visited Amisa Durham at her house. Amisa's sister, Rhonda, was not at the house.[4] Witherspoon asked Amisa if she wanted to see his new clothes. When she said yes, they crossed the street to Witherspoon's red Nissan Maxima. There, Amisa saw "expensive" new clothes and shoes Witherspoon bought that day that did not resemble the type of clothes Witherspoon typically wore. Witherspoon asked Amisa if she would help him count some money. Amisa initially agreed, at which point Witherspoon

---

[4] We refer to Amisa and Rhonda Durham by their first names to avoid confusion.

pulled out a luxury brand duffel bag that still had packaging wrapping its handles. Back in Amisa's house, Witherspoon opened the duffel bag and began removing bundles of money. Underneath the money, in the duffel bag, Amisa spotted and asked Witherspoon about a black vinyl briefcase. Witherspoon removed the case and opened it, showing Amisa an unassembled Uzi semi-automatic rifle. Witherspoon told Amisa he had another gun under the seat of his car. Amisa, who worked in the Los Angeles Police Department's property room and handled guns as part of her job, then changed her mind about counting the money. Witherspoon left her house between 8:50 and 9:05 p.m.

Shortly thereafter, at 9:25 p.m., Bill called Joel to find out about Rucker (Bill also had called about two hours earlier to inquire about Rucker). Bill arrived at Joel's house around 9:30 p.m. Also at 9:25 p.m., three and a half miles from Amisa's house, Vincent Cash heard a gunshot, followed by a burst of gunshots. Cash lived in a neighborhood—near a freeway—where Witherspoon owned a home (and used to live). Cash, who was watching television and talking on the phone at the time, did not hear a car stop, a door slam, or voices. After about four minutes on the floor, Cash got up and looked out the window toward the street, where he saw a motionless body. Cash called 911 at 9:27 p.m. Rucker bled to death from nine gunshot wounds shortly after paramedics arrived about 10 minutes later.

B. *The Police Investigation Leads to Witherspoon*

The day after Rucker's killing, Yolanda called their father to tell him Rucker had been killed. Harris attempted to reach Witherspoon, but did not speak with him until the following day,

September 9, 1989.  To Harris, Witherspoon claimed the ex-boyfriend of a dancer named Taboo must have shot Rucker.  According to Witherspoon, Rucker borrowed Witherspoon's car to drive Taboo home from Witherspoon's house.  Witherspoon hypothesized that the ex-boyfriend must have been at Taboo's home when they arrived, shot Rucker, then driven off in Witherspoon's car.  The car, Witherspoon told Harris, had little gas and so "whoever did Vince" would have run out of gas and left the car near the freeway close to where Rucker was shot.  Witherspoon told Harris the police had impounded the car with 12 kilograms of cocaine and $30,000 from the drug deal still in the trunk.  Witherspoon promised to recover the car and send Harris the drugs and cash:  "I am going to take care of it for you. . . .  Whatever Vince had I will see that you get it."  The next day Witherspoon told Harris that Taboo's cousin, not her ex-boyfriend, killed Rucker.

Following their investigation, the police determined that Rucker died from bullets either from a Smith & Wesson nine-millimeter pistol (a gun compact enough to fit under a car seat) or a rare model Uzi submachine gun.  They found 13 casings near Rucker's body.  They concluded several shots struck the ground and ricocheted.  The police found Rucker's wallet apparently undisturbed in his pocket along with a piece of paper that had the name "Rod" (Witherspoon's first name) and Witherspoon's phone number written on it.  An autopsy revealed the killer shot Rucker once in the back and several more times as he lay on the ground.

On September 11, 1989, four days after the shooting, Witherspoon spoke with the police.  He claimed he went to the adult entertainment bar with Rucker on the night of the murder.

Witherspoon stated that Rucker "had a hassle" with Taboo's boyfriend around 8:00 p.m., Rucker then borrowed Witherspoon's car to drive Taboo home. An hour later Taboo contacted Witherspoon to say her boyfriend shot Rucker. When questioned by the police, Taboo stated she had never heard of either Rucker or Witherspoon. Moreover, Taboo had not worked at the bar for several months (a fact corroborated by the bar's owner); on the day of the murder Taboo was at home recovering from a nervous breakdown. In a subsequent interview, Witherspoon insisted Rucker instead left with a different dancer, not Taboo, who did not have the same appearance or body markings that Taboo did.

Police obtained a warrant to search Witherspoon's car (which had not been impounded, contrary to what Witherspoon told Harris). With the help of Witherspoon's wife, the police located the car several miles from where Witherspoon lived. The car had no cocaine, cash, guns, bullets, or blood in it, but it did have scrapes and dents, evidence of a bullet ricochet on one side, and the trunk was wired shut. The police recovered an empty luxury brand duffel bag from Witherspoon's closet.

On September 14, 1989, the police arrested Witherspoon for Rucker's murder. Witherspoon made several calls from the jail. He told Harris that the police had arrested him for Taboo's murder (she was alive), not Rucker's, but that "we got the car, man" and he would send Harris "everything that Vince had coming." Witherspoon also called a neighbor and asked him to tell police he, the neighbor, drove Witherspoon's car home the night of Rucker's murder (the neighbor refused to lie to the police). Witherspoon called Amisa with an important message. He asked Amisa to have Rhonda tell police that on a date Amisa

could not remember (but which Witherspoon provided), Rhonda picked up Witherspoon at 9:00 p.m. in West Covina.

C. *Witherspoon's Trial and Conviction*

The People charged Witherspoon with first degree murder (§ 187) and robbery (§ 211) and alleged a robbery special circumstance under section 190.2, subdivision (a)(17).  The court granted Witherspoon's motion pursuant to section 995 to dismiss the robbery charge and the robbery murder special circumstance allegation because there was insufficient evidence independent of Witherspoon's extrajudicial statements to establish the corpus delicti for the robbery.

Before the close of the People's case in chief, counsel met in chambers to discuss jury instructions.  The trial court told the parties it would instruct the jury on first degree premeditated murder, robbery felony murder, and robbery.[5]  The court declined to instruct the jury on second degree murder, stating that the murder was "either premeditated or it's a robbery."  Over counsel for Witherspoon's objection, the court also agreed to instruct the jury on aiding and abetting because "there is a possibility that this was a set-up."

The jury found Witherspoon guilty of first degree murder without specifying whether Witherspoon committed premeditated murder or felony murder.  The verdict form mistakenly included

---

[5]      During the chambers conference, Witherspoon's counsel argued against the felony murder instruction because the court had dismissed the robbery count when it ruled on the section 995 motion.  In rejecting Witherspoon's argument, the court explained, "The reason the 995 was granted was that there was no corpus delicti robbery."  But, as the trial court explained it, "You don't need a corpus for a robbery-murder."  Witherspoon did not appeal this specific ruling.

the robbery murder special circumstance allegation the court had dismissed, and the jury found the allegation true. The court, however, never instructed the jury on that allegation and instead gave only the instruction for felony murder occurring during the commission or attempted commission of robbery. In the People's opposition to Witherspoon's motion for new trial, the People acknowledged the special circumstance allegation under section 190.2 was "mistakenly" included in the verdict form.[6] In May 1991 the court sentenced Witherspoon to a prison term of 25 years to life.

D. *Witherspoon's Direct Appeal*

Witherspoon appealed the judgment, arguing, among other things, that the court deprived him of due process when it instructed on a theory (felony murder) on which he was not charged. He further argued insufficient evidence supported the verdict, whether viewed as premeditated or felony murder. He also argued the trial court erred in instructing the jury on an aiding and abetting theory. This court affirmed the judgment (*People v. Witherspoon* (Mar. 14, 1994, B061260) [nonpub. opn.] (*Witherspoon I*).) In *Witherspoon I* this court held there was substantial evidence Witherspoon murdered Rucker deliberately

---

[6] The People argue Witherspoon is ineligible for relief under section 1172.6 because the jury found true the special circumstance allegation under section 190.2, subdivision (a)(17). As discussed, the verdict form included a special circumstance allegation under section 190.2, but the trial court never instructed the jury on that allegation because it was dismissed before trial. Thus, the jury's true finding on that allegation has no effect on Witherspoon's eligibility for relief under section 1172.6.

10

and with premeditation and during the commission of a robbery.[7]
The court also held the trial court properly gave the aiding and
abetting instruction because the "evidentiary gap" left by the lack
of any witness to the murder "allowed the possibility more than
one person was present and participated" in Rucker's murder.

E. *The Superior Court Denies Witherspoon's Petition for
Resentencing*

On February 27, 2019, Witherspoon filed a petition to
vacate the judgment and for resentencing under section 1172.6.[8]
In the petition, Witherspoon asserted several grounds for
resentencing. He claimed the prosecution pursued, and he was
convicted under a theory of, felony murder or murder under the
natural and probable consequences doctrine. He also asserted he
could not now be convicted of first or second degree murder
because of changes made to sections 188 and 189, and a prior
court or jury determined he was not a major participant and/or
did not act with reckless indifference to human life under
section 190.2, subdivision (d). Witherspoon also asserted he "did
not, with the intent to kill, aid, abet, counsel, command, induce,

---

[7] The People argue Witherspoon is ineligible for relief under
section 1172.6 because this court previously held the evidence at
trial was sufficient to prove express malice. As discussed,
however, the verdict does not indicate whether the jury convicted
Witherspoon of premeditated or felony murder, and a holding in
the alternative that substantial evidence supported either theory
on direct appeal is not equivalent to a finding beyond a
reasonable doubt, as now required by section 1172.6.

[8] The Legislature renumbered section 1170.95 as
section 1172.6 without changing the text of the statute. (See
*People v. Strong* (2022) 13 Cal.5th 698, 708, fn. 2.)

11

solicit, request, or assist the actual killer in the commission of murder in the first degree," that he "was not a major participant in the felony or I did not act with reckless indifference to human life during the course of the crime or felony," and that the victim of the crime was not a peace officer.

The superior court appointed counsel. In an informal opposition to the petition, the People argued Witherspoon was ineligible for resentencing because the trial evidence demonstrated he was the actual killer or a major participant who acted with reckless indifference to human life. On May 13, 2019, the People filed an addendum to their informal opposition attaching a copy of this court's 1994 opinion denying Witherspoon's direct appeal. Witherspoon filed a reply denying robbing or killing Rucker. The People filed another addendum submitting the reporter's transcript and clerk's transcript from the 1991 trial.

Without making an express finding that Witherspoon had made a prima facie case for resentencing, and without issuing an order to show cause, the superior court invited both parties to submit any additional evidence they deemed relevant. At an evidentiary hearing on December 13, 2019, the court referenced this court's 1994 opinion, asking Witherspoon's counsel about the opinion: "It seems pretty clear that your client is the accused perpetrator or certainly I mean how would he get out from under being the perpetrator being a major participant and acting reckless and indifferent? There's no one else involved and or at least no one else alleged to be involved itself and the actual killer?" When Witherspoon's counsel responded that multiple people could have killed Rucker, the court asked, "What evidence is there to suggest that any other identifiable person was present

12

and involved in the actual shooting? . . . [I]n the court of appeal opinion and they set forth the scenario . . . it seems to be the only logical scenario the jury could have done in order to determine the guilty verdict. So what scenario would there be? What evidence would there be to suggest their client was not the perpetrator and was not the participant?" After Witherspoon's counsel referred the court to a portion of the trial transcript involving comments by the court during a chambers conference, the court renewed its inquiry as to what scenario would not place Witherspoon as the perpetrator. Witherspoon's counsel then recited trial evidence in support of the argument that insufficient evidence supported Witherspoon as the actual killer.

On December 24, 2019, the court issued a written ruling denying the petition, finding Witherspoon "could still be convicted" of first degree murder under amended sections 188 and 189 in that he was a major participant in the robbery and acted with reckless indifference to human life. The court did not make a finding that Witherspoon was the "actual killer" under section 189, subdivision (e)(1), but did find Witherspoon "likely pulled the trigger himself."

F. *This Court Denies Witherspoon's Appeal, the Supreme Court Grants Review, the Legislature Enacts SB 775, and the Supreme Court Vacates and Remands*

Witherspoon timely appealed. He argued the superior court improperly "premised" its denial of his petition on inadmissible hearsay contained in the statement of facts section of this court's 1994 opinion affirming his conviction. He also asserted the court applied an incorrect burden of proof. Finally,

13

he claimed substantial evidence did not support the court's finding he acted with reckless indifference to human life.

On October 22, 2020, this court denied Witherspoon's appeal from the trial court's order denying his 1172.6 petition. On December 30, 2020, the California Supreme Court granted Witherspoon's petition for review and deferred further action while it decided *Lewis, supra,* 11 Cal.5th 952, pending at the time. Shortly thereafter, the Legislature enacted, and the Governor signed, SB 775, which took effect January 1, 2022 (Cal. Const., art. IV, § 8, subd. (c)).

On October 12, 2022, the Supreme Court transferred the cause back to this court with directions to vacate our October 22, 2020 opinion and reconsider our decision in light of SB 775.

## DISCUSSION

A. *Applicable Law*
1. *Senate Bill No. 1437*
"Effective January 1, 2019, the Legislature changed the substantive definition of murder by enacting Senate Bill 1437." (*People v. Clements* (2022) 75 Cal.App.5th 276, 290 (*Clements*). Senate Bill No. 1437 (SB 1437) amended sections 188 and 189, making "significant changes to the scope of murder liability for those who were neither the actual killers nor intended to kill anyone, including certain individuals formerly subject to punishment on a felony-murder theory." (*People v. Strong* (2022) 13 Cal.5th 698, 707 (*Strong*); accord, *Lewis, supra,* 11 Cal.5th at p. 957.) "Penal Code section 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' (Pen. Code, § 189, subd. (e)(1)) and those who, 'with the intent to kill,'

14

aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)).  Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2'—that is, the statute defining the felony-murder special circumstance." (*Strong,* at p. 708; accord, *People v. Gentile* (2020) 10 Cal.5th 830, 842.)

"Senate Bill 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended." (*Strong, supra,* 13 Cal.5th at p. 708; *People v. Gentile, supra,* 10 Cal.5th at p. 843.)  First, a convicted person files a petition with a declaration that the person meets the eligibility criteria.  (*Strong,* at p. 708; § 1172.6, subd. (b)(1)(A).)  The court then evaluates the petition "to determine whether the petitioner has made a prima facie case for relief." (§ 1172.6, subd. (c).)  "If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition." (*Strong,* at p. 708.)  But if the defendant has met the prima facie criteria, "the court shall issue an order to show cause." (§ 1172.6, subd. (c).)  If the parties stipulate to resentencing, or "there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner." (*Id.,* subd. (d)(2).)  "Otherwise, the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted

15

murder' under state law as amended by Senate Bill 1437."
(*Strong,* at p. 709.)

    2.    *SB 775*

At the time of the evidentiary hearing in this case, section 1172.6, subdivision (d)(3), provided that at the evidentiary hearing on a section 1172.6 petition, the People had to prove "beyond a reasonable doubt, that the petitioner is ineligible for resentencing."

"Effective January 1, 2022, [SB 775] amended section 1172.6 to clarify certain aspects of the law, including that (1) the burden of proof at a resentencing hearing under this section is 'on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder' under California law as amended by Senate Bill No. 1437 and (2) '[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (§ 1172.6, subd. (d)(3); see also Stats. 2021, ch. 551, § 1, subd. (c).)  Senate Bill No. 775 clarified that the trial court's role in a section 1172.6 proceeding is to act as an independent fact finder and determine, in the first instance, whether the petitioner committed murder under the law as amended by Senate Bill No. 1437." (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 123; see *People v. Garcia* (2022) 82 Cal.App.5th 956, 966; see also *People v. Garrison* (2021) 73 Cal.App.5th 735, 745 [the superior court acts as "an independent fact finder, to determine beyond a reasonable doubt whether defendant is guilty of murder under a valid theory of murder"].)

SB 775 also clarified that at the hearing on a petition, "admission of evidence in the hearing shall be governed by the Evidence Code" with some exceptions, among them that the superior court deciding the petition "may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) Courts have since interpreted the amended language to mean that, while the court may consider the procedural history, it may not (absent stipulation) consider the appellate court's factual summary in the same opinion. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 400, fn. 9 ["Senate Bill 775 prevents a trial court from relying on facts recited in an appellate opinion to rule on a petition under section 1170.95, as the statute now provides that 'the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law' and 'the *procedural history* of the case recited in any prior appellate opinion.'"]; *People v. Flores* (2022) 76 Cal.App.5th 974, 988 ["Furthermore, the factual summary in an appellate opinion is not evidence that may be considered at an evidentiary hearing to determine a petitioner's eligibility for resentencing."]; *Clements, supra,* 75 Cal.App.5th at p. 292 ["specificity [of amendment] indicates the Legislature has decided trial judges should not rely on the factual summaries contain in prior appellate decisions"].)

B. *Standard of Review*

Although the superior court did not issue an order to show cause under former section 1170.95, subdivision (c), we agree with the parties that the court intended the December 13, 2019 evidentiary hearing to be a section 1172.6, subdivision (d)(3), evidentiary hearing. The court invited the parties to submit new

17

or additional evidence outside the record of conviction, considered the record of conviction (and the parties' submissions), and decided the merits of Witherspoon's petition. If we find the superior court applied the correct burden of proof, we review the court's decision for substantial evidence because the court decided the merits of the petition based on its own independent factfinding. (*People v. Guiffreda, supra,* 87 Cal.App.5th at p. 125; *Clements, supra,* 75 Cal.App.5th at p. 298 ["our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt"]; *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232 (*Sifuentes*); *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.) "We view the facts in the light most favorable to the People. In this process, we presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence, whether direct or circumstantial." (*Mitchell,* at p. 591.)

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, 375.) "An appellate court must accept logical inferences that the [court] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "'"[A] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict."'" (*Sifuentes, supra,* 83 Cal.App.5th at pp. 233-234; see *People v. Penunuri* (2018) 5 Cal.5th 126, 142 [outlining sufficiency of evidence standard for guilt phase issues in direct appeal of death penalty case].)

Thus, "our sole inquiry is whether there was sufficient evidence for a reasonable trier of fact to conclude beyond a reasonable doubt" that Witherspoon was a major participant in the robbery who acted with reckless indifference to human life. (*Sifuentes, supra,* 83 Cal.App.5th at p. 234; § 189, subd. (e)(3).)

C. *Even Considering the SB 775 Amendments, the Superior Court Did Not Prejudicially Err When It Referenced the Statement of Facts in* Witherspoon I

Witherspoon contends the superior court improperly relied on the statement of facts in *Witherspoon I.* Prior to SB 775, Witherspoon argued the opinion in *Witherspoon I* constituted inadmissible hearsay. In his supplemental brief, he contends SB 775 made clear that facts in prior appellate opinions are inadmissible at the evidentiary hearing on a section 1172.6 petition. The People argue Witherspoon forfeited these arguments by failing to raise them in the superior court, and any error is harmless. We agree any error is harmless.

"Ordinarily, 'the failure to object to the admission of . . . hearsay at trial forfeits an appellate claim that such evidence was improperly admitted.'" (*People v. Perez* (2020) 9 Cal.5th 1, 7 (*Perez*); accord, *People v. Stevens* (2015) 62 Cal.4th 325, 333; see Evid. Code, § 353, subd. (a).) Among other reasons for this rule, requiring an objection in the trial court ""allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice."'" (*Perez,* at p. 7.) Accordingly, even if the statement of facts in *Witherspoon I* contained hearsay, which we do not need to decide, Witherspoon forfeited that argument by failing to raise it in the superior court.

19

However, Witherspoon's argument that SB 775 rendered the statement of facts from *Witherspoon I* inadmissible survives the People's forfeiture argument. "'"[R]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence."'" (*Perez, supra,* 9 Cal.5th at pp. 7-10 [defendant did not forfeit challenge to expert opinion based on case-specific hearsay because defendant could not have anticipated the change in law created by *People v. Sanchez* (2016) 63 Cal.4th 665].) Courts excuse "'"a failure to object where to require defense counsel to raise an objection "would place an unreasonable burden on defendants to anticipate unforeseen changes in the law."'"'" (*Perez*, at p. 8.)

At the time of the evidentiary hearing, former section 1170.95, subdivision (d)(3), permitted the parties "'[to] rely on the record of conviction . . . to meet their respective burdens,'" including the unlimited use of any prior appellate opinions. As discussed, courts have interpreted the amendments introduced by SB 775 to limit that reliance to "the procedural history of the case recited." (§ 1172.6, subd. (d); see, e.g., *Clements, supra,* 75 Cal.App.5th at p. 292 [the "Legislature limited use of prior appellate opinions [in hearings under section 1172.6, subdivision (d)], allowing trial judges to 'consider the procedural history of the case recited,'" but not "the factual summaries contained in prior appellate decisions when a section 1170.95 petition reaches the stage of a full-fledged evidentiary hearing"].

We need not decide here whether SB 775 precluded reliance by a trial court on the factual summary in an appellate opinion when considering a section 1172.6, subdivision (d)(3),

20

petition. Witherspoon did not forfeit his argument that the superior court improperly relied on the factual summary in *Witherspoon I* because he could not have foreseen the change in the law at the time of the evidentiary hearing. However, even if the court relied on the facts stated in *Witherspoon I*, and even if SB 775 prohibits that reliance, Witherspoon has not demonstrated a reasonable probability the court would have reached a more favorable result absent any error. (*Lewis, supra,* 11 Cal.5th at pp. 973-974 [denial of section 1172.6 petition evaluated under harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]; *People v. Myles* (2021) 69 Cal.App.5th 688, 706 [applying *Watson* in appeal from denial of section 1172.6 petition and finding any error in admitting parole assessment report harmless unless reasonably probable defendant would have obtained more favorable outcome if report had been excluded]; *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 447 ["Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred."].)

In fact, Witherspoon has not even tried to demonstrate some prejudice from the court's use of the factual summary in *Witherspoon I,* or that the superior court would have reached a different result without it. Witherspoon had multiple opportunities to supplement or object to the facts stated in *Witherspoon I* but never did. After the prosecution provided *Witherspoon I* to the superior court as part of its informal opposition, Witherspoon did not object to the statement of facts or offer any new or different evidence. Then, in advance of the evidentiary hearing, the court invited the parties to "file anything

21

else." Witherspoon did not submit any additional evidence. At the evidentiary hearing, the parties and the court referred to the facts as set forth in *Witherspoon I*, but Witherspoon never objected to the accuracy or consideration of those facts. For example, when wondering whether the evidence would support any "other scenario" besides the "logical scenario" that only Witherspoon was present and was the perpetrator, Witherspoon's counsel referred to the 1991 trial transcript but did not object to the court's characterization, drawn from the factual summary in *Witherspoon I*. Then, after the Supreme Court transferred the case to this court, and Witherspoon had the opportunity *in light of SB 775,* again to raise any objections to the accuracy of the factual summary discussed by the trial court, Witherspoon offered no objection whatsoever to the facts as presented in the prior opinion and arguably considered by the trial court.

Thus, at no time, including after transfer of the case back from the Supreme Court, has Witherspoon asserted that *Witherspoon I* somehow misstates the trial evidence. If the opinion accurately summarized the evidence, which Witherspoon appears to concede, then any reliance on it by the superior court would be harmless. (See *People v. Gamache* (2010) 48 Cal.4th 347, 378 [burden is on appellant "to affirmatively demonstrate error"].) Moreover, even assuming the superior court did rely to some extent on the (accurate) factual summary in *Witherspoon I,* it also relied extensively on the underlying trial record. At multiple points, the court discussed and referenced the trial record with the parties during the evidentiary hearing, rather than relying on the factual summary in *Witherspoon I*. As but one example, the court asked defense counsel, "What evidence would there be to suggest their client was not the perpetrator and

22

was not the participant?" In its ruling, the court stated that it took the background facts of the case "predominantly," but not solely, from *Witherspoon I* and cited the trial transcript in addition to *Witherspoon I.* Thus, even assuming the court did rely on some portion of the factual summary in *Witherspoon I*, Witherspoon has failed to demonstrate the court would have reached a more favorable result had it ignored the factual summary.

D. *Even Considering the SB 775 Amendments, Witherspoon Has Not Shown the Superior Court Applied the Wrong Standard*

Witherspoon contends the superior court applied an incorrect standard of proof at the evidentiary hearing. At the time of the evidentiary hearing, former section 1170.95, subdivision (d)(3), provided that "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." SB 775 clarified that the prosecution must prove, "beyond a reasonable doubt, that the petitioner is guilty of murder." (§ 1172.6, subd. (d)(3).)

Witherspoon argues the superior court's comment that Witherspoon "could still be convicted" of first degree murder under section 189, subdivision (e), suggests the court failed to follow the standard in place at the time of the evidentiary hearing. Witherspoon also complains about the court's statements that "it does not appear that the changes made to sections 188 and 189 would prevent [Witherspoon] from being convicted of murder" and that applicable law "suggests

[Witherspoon] was a major participant in the underlying crime."[9] While these statements could indicate a lower standard than "beyond a reasonable doubt," the court unequivocally stated in its conclusion that Witherspoon could still be convicted of first degree murder because he was a major participant in the underlying crime and acted with reckless indifference to human life. In supplemental briefing, Witherspoon also argues that published appellate cases *after* Witherspoon's evidentiary hearing set out what is now an incorrect standard. From this, Witherspoon infers courts at the time also applied the same incorrect standard and we "should not presume that the trial court knew and applied the correct standard." The People argue Witherspoon has failed to demonstrate the court applied an incorrect standard and any error was harmless. We agree that Witherspoon has failed to show the court applied an incorrect standard.

Witherspoon bears the burden of affirmatively demonstrating error. (*People v. Gamache, supra,* 48 Cal.4th at p. 378.) We resolve any uncertainty in the record against the appellant. (*Ibid.; People v. Chubbuck* (2019) 43 Cal.App.5th 1, 12.) Here, Witherspoon concedes the superior court made statements indicating the court applied the correct standard. The court's process and ruling also support finding it applied the correct standard. For example, the court did not conduct a quasi-appellate hearing at which it relied on briefs and argument. It ordered an evidentiary hearing, engaged in independent fact-finding, examined the trial court record, and engaged with

---

[9]     Witherspoon concedes he was a major participant in the crime for purposes of his section 1172.6 petition.

counsel regarding whether the underlying trial evidence supported a finding that Witherspoon acted with reckless indifference to human life under *Banks, supra,* 61 Cal.4th 788 and *Clark, supra,* 63 Cal.4th 522. The court then concluded that Witherspoon could still be convicted of first degree murder because he was a major participant in the underlying crime and acted with reckless indifference to human life. While the court may have used some imprecise language, the overall approach it took, the manner in which it conducted the hearing, and its ultimate ruling all demonstrate that it applied a standard of beyond a reasonable doubt, the correct standard even after SB 775.

E. *Substantial Evidence Supports the Superior Court's Ruling That Witherspoon Acted with Reckless Indifference to Human Life*

Witherspoon contends insufficient evidence supports the superior court's finding that he does not qualify for section 1172.6 relief. Witherspoon does not challenge the court's finding that he was a major participant. However, he argues that substantial evidence did not support the court's finding he acted with reckless indifference to human life. The People disagree, arguing substantial evidence supports a finding, beyond a reasonable doubt, that Witherspoon acted with reckless indifference to human life (and that he was the actual killer).[10]

---

[10] This aspect of Witherspoon's appeal is not affected by either the original rationale for the grant of review (the then-pendency of *Lewis, supra,* 11 Cal.5th 952), or the subsequent enactment of SB 775. *Lewis* addressed when the superior court must appoint counsel after a petitioner has filed a facially

25

1. *The* Banks/Clark *Factors*

Penal Code section 189, as amended, now limits liability under a felony-murder theory principally to "actual killer[s]" (§ 189, subd. (e)(1)) and those who, "with the intent to kill," aid or abet "the actual killer in the commission of murder in the first degree" (*id.*, subd. (e)(2)).  Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were "'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2'—that is, the statute defining the felony-murder special circumstance." (*Strong, supra,* 13 Cal.5th at p. 708; accord, *People v. Gentile, supra,* 10 Cal.5th at p. 842.)

In determining whether Witherspoon acted with reckless indifference to human life, we apply the factors set forth in *Banks, supra,* 61 Cal.4th 788 and *Clark, supra,* 63 Cal.4th 522. (Accord, *In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*) ["Reckless indifference to human life is 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'"].)

In *Banks* the Supreme Court identified factors relevant to determining whether a defendant was a major participant in the underlying felony.  It also described the state of mind necessary

---

sufficient 1172.6 petition, and confirmed that after appointment of counsel and an opportunity for briefing, the superior court may then consider the record of conviction to "determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.'"  (*Lewis,* at p. 957.)  SB 775 then clarified what aspects of the record of conviction the court could consider, among other issues.

26

to show a reckless indifference to human life: "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Banks*, *supra*, 61 Cal.4th at p. 808.) The Supreme Court distinguished between "a participant in an armed robbery [who] could anticipate lethal force might be used" and one who "knew his own actions would involve a grave risk of death." (*Id.* at pp. 807-808.) The factors identified by the *Banks* court are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

    *Clark* then explained the mental state and conduct necessary to show reckless indifference to human life, and identified five nonexclusive factors to determine whether a defendant's state of mind and conduct meet that standard:[11]

---

[11] Reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) The necessary state of mind is "'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'" (*Id.* at p. 616; accord, *Scoggins, supra*, 9 Cal.5th at p. 676.) Thus, the inquiry has subjective and objective

(1) the defendant's knowledge of weapons, the number of weapons used, and the defendant's use of weapons; (2) the defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the interaction between the perpetrators of the felony and the victims; (4) the defendant's knowledge that his cohort was likely to kill; and (5) whether the defendant made efforts to minimize the risk of violence during the felony. (*Clark, supra,* 63 Cal.4th at pp. 618-622; see *Scoggins, supra,* 9 Cal.5th at p. 677.).

The *Banks* factors interrelate with the *Clark* factors: "'[T]he greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark, supra,* 63 Cal.4th at p. 615.)

---

elements. (*Scoggins,* at p. 677.) "As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Ibid.*)

28

2. *The* Banks/Clark *Factors Show Witherspoon Acted with Reckless Indifference to Human Life*

The superior court analyzed the *Clark* factors and compared the facts of this case to the facts in *Banks* and *Clark.* The court concluded that Witherspoon acted with reckless indifference to human life. Substantial evidence supports the court's finding.

*Weapons*: The first factor supports a finding of reckless indifference to human life. Witherspoon effectively concedes ("there was inferential evidence") he was at the scene of the crime with his car.[12] We accept that factual inference, as we must, in favor of the court's ruling. (*People v. Mitchell, supra,* 81 Cal.App.5th at p. 591.) The evidence also showed that Witherspoon had two guns with him, based on what he told Amisa (a semi-automatic rifle in his duffle bag and a smaller gun that could fit under the seat in his car). Bringing weapons to the scene of the crime weighs in favor of finding reckless indifference to human life. (*Clark, supra,* 63 Cal.4th at p. 618.)

*Physical presence and opportunities to restrain crime or aid the victim*: The second factor also supports a finding of reckless indifference to life. In addition to Witherspoon's concessions regarding his presence at the scene of the crime, substantial evidence supports that conclusion. Rucker had plans to meet Witherspoon around the time of the shooting to consummate their drug deal. Amisa saw Witherspoon (and one of his guns) in his car shortly before the shooting. Witherspoon's car had damage from a bullet. The police concluded that the shooter fired

---

[12] Elsewhere, Witherspoon states he "was likely at the shooting scene."

29

at Rucker as he lay on the ground, and that some bullets ricocheted off the ground, which would account for the bullet hole in the car.  The location of the shooting was near where Witherspoon once lived and still owned a house.  Witherspoon told Harris the location of the shooting before police arrested and questioned Witherspoon.  Taken together, this evidence—albeit circumstantial—places Witherspoon at the scene of the crime. (*People v. Brooks* (2017) 3 Cal.5th 1, 57 ["'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'"].)

Other evidence relating to the second factor also shows reckless indifference to human life.  Witherspoon was physically present from the very first telephone conversation arranging to sell Rucker up to 20 kilograms of cocaine, to meeting with Rucker in Los Angeles, to collecting the money Rucker brought with him by transferring it from the gray Ford to his car.  Thus, Witherspoon was present for the "entire sequence of events culminating in the murder[ ]," and his "[p]roximity to the murder and events leading up to it [are] particularly significant."  (*Clark, supra,* 63 Cal.4th at p. 619.)  In addition, Witherspoon could have, but did not, act "as a restraining influence on murderous cohorts" if any existed.  (*Id.* at p. 619.)  Witherspoon had approximately a week to alter the plan, abort it, or decide to simply take the money without killing Rucker.  "A defendant is more culpable when he does nothing to avoid violence despite having time to reflect and consider his options."  (*In re McDowell* (2020) 55 Cal.App.5th 999, 1014.)  Moreover, even if, as Witherspoon speculates without evidence, someone else shot Rucker, Witherspoon did not call for help or otherwise attempt to aid Rucker.  (See *Clark,* at p. 619 [failing to make "'an effort to

30

help the victims'" shows reckless indifference to human life]; *In re Loza* (2017) 10 Cal.App.5th 38, 53-54 ["particularly significant" that defendant was physically present and did attempt to aid victim].)  Witherspoon argues that he could not have aided Rucker because the bullets killed him.  But the trial evidence showed, and Witherspoon's counsel conceded, that Rucker died after the paramedics arrived, several minutes after the shooting.

*Duration of interaction between defendant and victim*:  This factor is neutral.  The evidence does not indicate Rucker was "held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods." (*Clark, supra,* 63 Cal.4th at p. 620.)  Although Witherspoon spent time with Rucker during the week before the shooting, and that day, we cannot say the duration of the interaction during the crime favors a finding of reckless indifference to human life.

*Defendant's knowledge that his cohort was likely to kill*: This factor does not apply.  No evidence supports Witherspoon's speculation that someone else killed Rucker.

*Efforts to minimize the risk of violence during the felony*: This factor supports the reckless indifference finding.  No evidence suggests Witherspoon did anything to minimize the risk of violence.  Rather, Witherspoon planned to take Rucker's money but then met with Rucker after taking his money, with two guns, apparently to kill him (or aid someone else in doing so).  The last meeting between Rucker and Witherspoon served no purpose other than for Witherspoon to kill Rucker; Witherspoon already had the money.  Thus, Witherspoon planned the crime to "elevate[ ] the risk to human life beyond those risks inherent in any armed robbery." (*Clark, supra,* 63 Cal.4th at p. 623.)

31

Witherspoon argues that he took Rucker's money "non-violently," with no evidence he planned to "harm or kill anyone." We reject this myopic, inaccurate view of events. Witherspoon planned, as the superior court found, a "week-long scam" to take Rucker's money without exchanging the promised cocaine. Although the initial taking was "non-violent," that is only because Rucker believed he would later get the cocaine. Substantial evidence supports that Witherspoon intended to kill Rucker instead of giving him the cocaine. Rather than simply absconding with Rucker's money, Witherspoon met with Rucker again, drove him to a dark street in a neighborhood close to a freeway, and shot (or, much less likely, had someone else shoot) Rucker. Witherspoon used the gun for more than merely to create fear as in a "'garden-variety armed robbery.'" (*Clark, supra*, 63 Cal.4th at p. 617, fn. 74.) Witherspoon used the gun to "take care of" Rucker, as he had promised, and to keep the money he already had taken from Rucker under false pretenses. Contrary to Witherspoon's speculation that shooting Rucker reflected a "spontaneous reaction" (by someone), the evidence showed Witherspoon met Rucker that night for one reason: to kill him.

## DISPOSITION

The superior court's order is affirmed.


                                        HOWARD, J.*

We concur:



        PERLUSS, P. J.



        SEGAL, J.

---

*     Judge of the Marin County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.